**MUTUAL BEN. LIFE INS. CO. v. DUFFY, Internal Revenue Collector.**

(District Court, D. New Jersey. February 19, 1924.)

1. Insurance ⊂⊃63—On dissolution of mutual company, holders of unmatured
policies held entitled to pro rata share in legal reserve.
On the dissolution of a mutual insurance company, the holders of
unmatured policies, after the payment of matured policies, share pro
rata in the assets of the company, including the legal reserve, in the
same manner as stockholders share in assets of a corporation.

2. Internal revenue ⊂⊃7—Whether legal reserves of insurance companies are lia-
bilities depends on purpose of tax.
Whether legal reserves of insurance companies are liabilities for pur-
poses of taxation depends on the particular kind of tax imposed and the
legislative policy adopted in regard thereto.

3. Internal revenue ⊂⊃7—Legal reserve of mutual insurance company held "in-
vested capital" within excess profits tax; "business;" "trade."
The legal reserve of a mutual insurance company required by state
law to secure payments of policies at maturity, which was built up from
premiums paid in by policy holders and income derived from invest-
ments, held to be "invested capital," within Revenue Act Oct. 3, 1917, tit.
2, §§ 201, 203, 206, 207 (Comp. St. 1918, §§ 6336⅜a, 6336⅜b, 6336⅜d,
6336⅜g, 6336⅜h), in view of the purpose of the act to tax excess war
profits, and that mutual insurance companies are not in "business" or
"trade," in the usual meaning of terms.
[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Business; Capital Invested; Trade.]

**4. Statutes ⊚⇒217—When no report made in regard thereto, debates In Congress and discussions before committees may not be resorted to in construing statutes.**

In the absence of formal reports from committees explanatory of the provisions of statutes, the meaning thereof is not to be determined from the debates in Congress pending their passage, a fortiori as to discussions before a congressional committee, where no report is made in regard thereto.

At Law. Action by the Mutual Benefit Life Insurance Company against Charles V. Duffy, Collector of Internal Revenue. On motion to strike out amended complaint. Motion denied, and judgment given for plaintiff.

John O. H. Pitney, John R. Hardin, David Kay, Jr., and Jay Ten Eyck, all of Newark, N. J., for plaintiff.

Walter G. Winne, U. S. Atty., of Hackensack, N. J., Frederic M. P. Pearse, Asst. U. S. Atty., of Newark, N. J., Walter Bacon, Asst. U. S. Atty., of Bridgeton, N. J., and Carl A. Mapes, Solicitor of Internal Revenue, and Newton K. Fox, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant.

RELLSTAB, District Judge. The plaintiff, a New Jersey corporation, sues to recover from the defendant, collector of internal revenue for the Fifth district of New Jersey, $83,779.70, war excess profits tax, imposed upon it for the year 1917, which it paid under protest. It has complied with the necessary prerequisites for the instituting of the present suit. The tax was imposed under the Revenue Act of October 3, 1917. The defendant moves to strike the complaint. It has been so framed (several times amended) as to present all the facts necessary to a final determination, and by stipulation the decision on this motion is to be a final disposition of the controversy in this court.

The plaintiff is a mutual company, having no capital stock or stockholders, and never carried on any business other than that of mutual life insurance. The plaintiff's policy holders are its members, and they elect from among themselves the directors who manage its business. This business is conducted upon the "level premium plan," under which the maximum annual contribution paid by the policy holder in premiums is uniform throughout the life of the policy. In determining the "level premium" there is added to the mathematical computation of the cost of insurance an amount to provide for salaries, taxes, and other expenses of conducting the business, and to take care of unforeseen contingencies, which addition is called "loading."

The plaintiff's assets consist solely of these premiums, the investment thereof, and the income derived from these investments. Inasmuch as the stipulated uniform premiums are in excess of the cost of insurance during the earlier years of the policy, and not sufficient to pay the cost of the insurance during its later years, a portion of this excess is by law required to be set aside and held as a reserve or guarantee fund (called the legal reserve) to maintain the insurance

during the later years. At the end of each year the excess of income over disbursements is ascertained, and, after applying so much thereof as is required for the increase of its legal reserve and an additional sum to care for unanticipated losses, expenses, and shrinking of earnings—an additional safeguard of the stability and continuity of the legal reserve—the balance is returned to the policy holders as a dividend or credit upon their next annual premiums.

A detailed statement of this method of conducting mutual life insurance on the "level premium plan" and the nature and application of the excess payments of premiums is set out in Mutual Benefit Life Insur. Co. (the plaintiff herein) v. Herold (D. C. N. J.) 198 Fed. 199, 202–204, and Connecticut General Life Ins. Co. v. Eaton (D. C. Conn.) 218 Fed. 188. The laws of the states in which the plaintiff carries on its business require that its assets shall not be less than this legal reserve. The amount of the latter, as fixed by the commissioner of banking and insurance of the state of New Jersey on January 1, 1917, was $186,258,796. In the plaintiff's management of its assets there is no segregation or special allocation of any part thereof, and the legal reserve is not separately held or invested.

Under the provisions of title 1 of the Revenue Act of September 8, 1916 (39 Stat. 756), as amended by title 1 of the Act of October 3, 1917 (40 Stat. 300), the plaintiff filed an income tax return for the year 1917, showing a net income of $1,808,339.33, and paid a tax of $108,500.36. In this return was included all the interest obtained from its securities and investments not specifically exempt from tax. Under the provisions of title 2 of the last-mentioned act (Comp. St. 1918, §§ 6336⅜a–6336⅜o), the plaintiff also filed an excess profits tax return for the year 1917, showing, on its basis of computation, that no such tax was due. In this return it declared its invested capital to be $202,685,846.45, which included its legal reserve of $186,-258,796. Thereafter, on June 10, 1920, the Commissioner of Internal Revenue (hereinafter referred to as the Commissioner) amended the excess profits tax return, deducting this reserve from the invested capital, allowing only $14,719,043.76 as such capital, and imposing the excess profits tax sought to be recovered in this suit. This deduction, or nonallowance, is the basis of the plaintiff's suit.

[1, 2] The government contends that the legal reserve of a mutual insurance company cannot be its invested capital, because it does not belong to it, but to the policy holders; that such fund is in the nature of a trust fund, and is in fact a liability, and not an asset. For some purposes this reserve is a liability, or a trust fund; but so is the capital subscribed by shareholders in a stock corporation. Both are treated as a liability in balancing assets and liabilities. In the case of an insolvent stock corporation, its assets are charged with a trust in favor of creditors. On the dissolution or liquidation of a stock corporation, the capital remaining after the payment of debts belongs to the shareholders. So, on the dissolution of a mutual insurance company, the holders of unmatured policies, after the payment of matured policies, share pro rata the assets of the company, including the legal reserve. Mayer v. Attorney General, 32 N. J. Eq. 815, 822.

If the legal reserve of a mutual life insurance company is a liability or trust fund in favor of the policy holders, as the government contends, so are the other assets of the company. The difference between them is merely that the former is required by law to be maintained intact as a guaranty for the payment of such policies, and cannot lawfully be diverted to other uses. Under certain tax laws the legal reserves of insurance companies are treated as liabilities. Whether they are to be so considered depends upon the particular kind of tax imposed and the legislative policy adopted in regard thereto.

[3] In the instant case the character of the plaintiff's assets is involved, and the specific question is whether its reserve, or at least $25,500,000 thereof, is invested capital, within the meaning of title 2, "War Excess Profits Tax," of the Revenue Act of October 3, 1917. The pertinent parts of this title follow:

"Sec. 200. That when used in this title—

"The term 'corporation' includes joint-stock companies or associations and insurance companies. * * *

"The term 'pre-war period' means the calendar years nineteen hundred and eleven, nineteen hundred and twelve, and nineteen hundred and thirteen. * * *

"Sec. 201. That in addition to the taxes under existing law and under this act there shall be levied, assessed, collected, and paid for each taxable year upon the income of every corporation, partnership, or individual, a tax (hereinafter in this title referred to as the tax) equal to the following percentages of the net income:

"Twenty per centum of the amount of the net income in excess of the deduction (determined as hereinafter provided) and not in excess of fifteen per centum of the invested capital for the taxable year. * * *

"Sec. 203. That for the purposes of this title the deduction shall be as follows, except as otherwise in this title provided—

"(a) In the case of a domestic corporation, the sum of (1) an amount equal to the same percentage of the invested capital for the taxable year which the average amount of the annual net income of the trade or business during the pre-war period was of the invested capital for the pre-war period (but not less than seven or more than nine per centum of the invested capital for the taxable year); and (2) $3,000. * * *

"Sec. 206. That for the purposes of this title the net income of a corporation shall be ascertained and returned * * * (c) for the taxable year upon the same basis and in the same manner as provided in title I of the act entitled 'An act to increase the revenue, and for other purposes,' approved September eighth, nineteen hundred and sixteen, as amended by this act. * * *

"Sec. 207. That as used in this title, the term 'invested capital' for any year means the average invested capital for the year, as defined and limited in this title, averaged monthly.

"As used in this title 'invested capital' does not include stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title, nor money or other property borrowed, and means, subject to the above limitations:

"(a) In the case of a corporation or partnership: (1) Actual cash paid in; (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment, * * * and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year. * * *" (Comp. St. 1918, §§ 6336⅜a, 6336⅜b, 6336⅜d, 6336⅜g, 6336⅜h).

The pertinent parts of the act of 1916, referred to, follow:

"Title I—Income Tax.

"Part II—On Corporations.

"Sec. 10. That there shall be levied, assessed, collected, and paid annually upon the total net income received in the preceding calendar year from all sources by every corporation, joint-stock company or association, or insurance company, organized in the United States, no matter how created or organized but not including partnerships, a tax of two per centum upon such income. * * *

"Deductions.

"Sec. 12 (a) In the case of a corporation, joint-stock company or association, or insurance company, organized in the United States, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources—

"First. All the ordinary and necessary expenses paid within the year. * * *

"Second. All losses actually sustained and charged off within the year and not compensated by insurance or otherwise, including a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in the business or trade; * * * (c) in the case of insurance companies, the net addition, if any, required by law to be made within the year to reserve funds and the sums other than dividends paid within the year on policy and annuity contracts. * * *

"Third. The amount of interest paid within the year on its indebtedness. * * *

"Fourth. Taxes paid within the year. * * * (Comp. St. §§ 6336j, 6336l).

Section 4 of title I—War Income Tax—of the act of October 3, 1917, so far as pertinent, provides:

"Sec. 4. That in addition to the tax imposed by subdivision (a) of section ten of such act of September eighth, nineteen hundred and sixteen, as amended by this act, there shall be levied, assessed, collected, and paid a like tax of four per centum upon the income received in the calendar year nineteen hundred and seventeen and every calendar year thereafter, by every corporation, joint-stock company or association, or insurance company, subject to the tax imposed by that subdivision of that section. * * *

"The tax imposed by this section shall be computed, levied, assessed, collected, and paid upon the same incomes and in the same manner as the tax imposed by subdivision (a) of section ten of such act of September eighth, nineteen hundred and sixteen, as amended by this act. * * *" (Comp. St. 1918, § 6336jj).

It is noted that section 207 above, in its definitions, is both exclusive and inclusive.

The government contends that all the legal reserve in question is excluded by this section, because, first, it is within its nonincluding paragraph; and, second, because it is not within its including paragraph. The restrictive words of title II, "War Excess Profits Tax," suggest a doubt that it could have been the legislative purpose to include mutual life insurance companies in the operation of the tax provisions of this title. These companies are not in business for gain, in the ordinary commercial sense. Their purpose is by co-operation to secure life insurance at cost. Excessive gains or profits are foreign to their purpose at any time, and war conditions are singularly likely to increase their losses without affording them any additional opportunity to increase their net gains. Experience has proven that a state of war increases the burdens of life insurance companies greatly in excess of those imposed on other kinds of business.

In the Revenue Act of March 3, 1917, an additional tax on the income of corporations, under the head "Excess Profits Tax," was authorized. This country's entrance into the World War, following shortly thereafter, necessitated a larger revenue than that contemplated when that act was passed. The bill which culminated in the act of October 3, 1917, repealed all the sections composing title II, "Excess Profits Tax," of the act of March 3, 1917 (39 Stat. 1000), and as passed by the House did not contain the word "war" in the title dealing with excess profits. This word, used as indicating a reason for increased revenue, appears for the first time in the Revenue Act of October 3, 1917, and was the result of amendments reported to the Senate by its Finance Committee, which, in support of the amended bill, said:

"It is estimated that the House Bill will raise from excess profits taxes an additional amount of $200,000,000, while it is estimated that the bill as amended by your committee will raise from war profits taxes an additional amount of $562,000,000.

"After mature consideration your committee reached the conclusion that, in view of the large amount to be raised and the enormous war profits, amounting to nearly $3,000,000,000, shown by the income tax returns of corporations for 1916, which amount will undoubtedly be increased for the year 1917, due in the main to war and war conditions, $562,000,000 was not an unreasonable additional amount to ask from the industries whose earnings have been so greatly augmented by the conditions which made necessary the call for this additional revenue. * * *

"Your committee accordingly proposes the repeal of the existing war profits tax law, and the substitution for both it and the additional war profits tax passed by the House of a tax upon a basis similar to that followed by the European countries in which such taxation has been carried out with marked success. The committee proposes, instead of an excess profits tax, a war profits tax. In general, it proposes to make the basis of the tax the difference between the profits of the pre-war period and the profits of the taxable year. We take by taxation, directly or indirectly, for the purposes of war, a part of the extra gains which war itself has caused."

Here is an unequivocally expressed declaration that the extra gains made out of conditions produced by the war should bear the extra governmental expenses incident to it, and that the standard for comparison should be the profits of the pre-war period, which the act (section 200), as noted, defined as the calendar years 1911, 1912, and 1913. This declaration by the Senate Committee, as the reason for imposing a war excess profits tax, tends to show that Congress, when it dealt with the "War Excess Profits Tax" provisions of the act of October 3, 1917, did not have in mind enterprises of the character of mutual life insurance companies, whose business it is to provide its members with insurance at cost, and which could not make extra gains as a result of war conditions, but, on the contrary, by reason thereof, were bound to suffer increased losses on account of war casualties and epidemics of diseases which usually follow in war's wake, as well as increased expenses in conducting their business.

An examination of the returns made by the plaintiff for the years 1911 to 1917, inclusive, for federal income tax purposes, discloses that while both its gross income and expenditures steadily increased, the increases were quite conservative, the average increase from 1913 being less than 7 per cent. The return for 1918, on the contrary,

shows that, while the gross income increased at about the same rate, the increase in expenses and losses over 1917 exceeded 12 per cent. While the end of military operations in 1918 necessarily limited the scope of the comparison for this purpose, yet even this short period confirms the concept that a life insurance company is more likely to lose than gain during a war period—more likely to have excessive losses than excessive profits. None of the plaintiff's assets during 1917 yielded a greater income than 6 per centum per annum, and the average rate of interest or return on its invested assets for many years was less than that percentage.

Mutual insurance companies are not in business or trade in the ordinary acceptation of these terms. They are distributors, not producers, of wealth. Their business is, as stated, to insure their members at cost. In this business some gains are planned and expected, but only to reduce the cost of insurance. To this end the premiums—the only primary source of revenue—are purposely made larger than the calculated bare cost of insurance. This excess is invested and the income thereof compounded. Whatever the gains, they are distributed, not as dividends in the ordinary sense, but to reduce the cost of insurance to the members. Gains of that kind, even if they exceed anticipation, are not of the character sought by the tax acts under consideration. True, it is possible that for a given year, by reason of increased income—premiums and interest—on the one hand, and unlooked-for decreases in losses and expenses on the other hand, the net income may be larger. However, the income, whatever its source and whatever its size, is subject to federal income taxes. Under the ruling of the Commissioner, presently to be more particularly referred to, such parts of this income as exceed debts, liabilities, and payments to legal reserve, became invested capital within the meaning of the excess profits tax provisions of the act of October 3, 1917.

Under other titles of this act the rate of the ordinary income tax was considerably increased, but under title 2 Congress reached out for and taxed only such income as represented excessive profits. In that title (section 203), as noted, it decided that a profit of between 7 per cent. and 9 per cent. on invested capital was not excessive. In construing the sections under title 2, regard must be had to this legislative purpose and decision. So regarded, it is manifest that the excess profits tax was sought only from those who, notwithstanding the payment of the increased ordinary income tax, would still be possessed of excessive profits. Under this Revenue Act, the basis, or starting point, for determining whether an excess profits tax should be paid, is the net income subject to the ordinary tax under title 1, part 2, of the act of September 8, 1916. The plaintiff, in its tax return for the year 1917, reported its total gross income at $42,893,-564.95, made up as follows:

"3. (a) From premiums .................................... $31,788,744.28
    (b) Income from rentals ...............................      103,633.39
    (c) Income from interest ..............................    9,821,630.74
    (d) Income from dividends .............................             0
    (e) Income from all other sources......................    1,179,556.54
                                                             ─────────────
        Total gross income ........................ $42,893,564.95"

Among the deductions authorized by that act in ascertaining the net taxable income in the case of insurance companies, and the only one that needs special mention, is "the net addition, if any, required by law to be made within the year to reserve funds." Section 12 (a), second (c). In the return in question this amounted to the sum of $14,557,131. The government does not dispute the correctness of this amount of net addition, nor any of the items constituting the gross income thus reported. From this return it is noted that, of the total gross income for 1917, $31,788,744.28 is from premiums and $9,821,-630.74 and $103,633.39 is from interest and rents, respectively.

In amending the plaintiff's excess profits tax return, the Commissioner, applying section 203 (a), above, allowed only $9,657,529.56 as its average invested capital for the pre-war period, and calculated its average taxable income for such period at $869,678.46 or 9.005 per cent. In computing this average he refused to allow any of the legal reserve as part of the invested capital for the pre-war period, and in fixing such capital for the year 1917 he, of course, adhered to the same ruling, with the result that, as before stated, the invested capital for that year, as computed by him, was reduced from $202,-685,846.45 to the sum of $14,719,043.76. This sum is less than $5,000,000 more than the total income received from the actual invested assets of the company for that year; such income equaling 67.42 per cent. of the amount allowed as invested capital. As noted, so much of this reserve as was not interest from invested assets was obtained from the members of the corporation—policy holders—in the shape of premiums. These premiums were deliberately made larger to permit of a part being applied to the legal reserve. By such contribution the plaintiff's only capital fund was created and maintained. Without such redundancy of premiums the plaintiff could not have either complied with the statute requiring such reserve, or produced the nearly $10,000,000 interest which swelled the income on which it paid a federal income tax.

To tax the income derived largely from an invested fund and deny that the fund is invested capital is neither logical nor consistent, and such a result should not be allowed, unless the statutory definition permits of no other course. This the government does not dispute. It insists, however, that the statutory definitions requires such exclusion. In its exclusive provision, as already noted, it is declared that, as used in this title, invested capital does not include—"stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title nor money or other property borrowed. * * *" Concerning this feature of the definition, the government contends that, as the net additions to reserve fund were deducted in ascertaining the net income subject to normal tax, it cannot be treated as invested capital, for the reason that these additions are "other assets, the income from which is not subject to the tax imposed by this title." On the other hand, the plaintiff insists that "the character of the asset and not the use to which the income derived therefrom is put determines whether the asset shall be excluded from 'invested capital' and, furthermore, that the income from the reserve does not escape taxation."

At the outset, in, considering this contention of the government, it should be observed that the net additions made in 1917 are not part of the legal reserve which the plaintiff seeks to have allowed as invest-, ed capital. This reserve is made up solely of net additions of preceding years. Plaintiff has been doing business since 1845, and created and maintained a policy reserve for more than a quarter of a century before the New Jersey statute (P. L. 1872, pp. 8, 30) required it. During its earlier years, with few exceptions, the plaintiff's premiums furnished the larger contribution to this reserve, while during its later years the interest contributions to this fund exceeded those derived from premiums.

The income obtained from the investment of this legal reserve furnished nearly 80 per cent. of the income other than that obtained from premiums, and was so reported in item 3c of its return for normal federal tax purposes, and no deduction thereof, as such, was claimed or allowed. The fact that the "net additions to reserve fund" made in the year 1917 were deducted in determining the net income of plaintiff subject to the normal tax of that year does not support the government's contention that this legal reserve is "assets, the income from which is not subject to the tax" in question. Neither does the fact that a part of the interest obtained from the invested reserve was appropriated to such net additions, furnish additional support for such contention. The entire addition could have been taken as well from premiums received. The particular source from which the net additions are made up is not important; the controlling fact on this branch of the inquiry is that all the income derived from the legal reserve was reported as income subject to taxation, and was so subjected. The legal reserve, therefore, is not within the part of section 207 which declares what shall not be included as "invested capital." What Congress seemingly had in mind in this general reference to "assets," the income whereof was not subject to excess profits tax, was obligations of states and municipalities, other than bonds, such as short term notes, which share with these bonds immunity from federal taxation.

The government next contends that this reserve is not within that part of section 207 (paragraph [a]), which declares what shall be "invested capital" for like tax purposes. This paragraph declares, as noted, that in the case of corporations such capital includes—

"(1) Actual cash paid in; (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation * * * at the time of such payment, * * * and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year."

All three subdivisions of this paragraph are readily applied to corporations having capital stock, but their wording is inept to mutual corporations, which have no such stock. Subdivision (2) concededly is not applicable. As applied to a stock corporation, subdivision (1) includes only cash paid for capital stock, as cash paid in to surplus is made capital by subdivision (3), and this latter subdivision, similarly applied, is restricted to cash paid in to surplus and earned

surplus or undivided profits used or employed in the business. But, inept as the language of these subdivisions is, when applied to mutual life insurance companies having no capital stock, the government insists that such companies are subject to the excess profits tax provisions of this act, and further that, unless this legal reserve can be brought within one or the other of these subdivisions, it cannot be treated as invested capital, and still further that such reserve is not comprehended within any of such subdivisions. As noted, section 200 of the same title (War Excess Profits Tax), declares that the term "corporation," as used in that title, includes "insurance companies." Except for such inclusion, there seemingly would not be even a plausible ground for the effort to include income derived from life insurance business within the grasp of the excess profits tax provisions of the act; but as there are capital stock insurance companies that insure against fire and marine, as well as life, risks, something more than this definition is needed to bring mutual life insurance companies within the tax provisions of this title.

The very ineptness of the language of paragraph (a) of section 207 tends to support the plaintiff's contention that Congress had no purpose to subject mutual insurance companies to this war excess profits tax, and that the insurance companies embraced in the definition of section 207 were confined to stock insurance companies. However, as mutual life insurance companies are not expressly excluded from the excess profits tax provisions of the act, and assuming for the sake of argument that Congress had no intention of so excluding or exempting them, it must be further assumed that Congress did not intend to exclude them from the benefit of paragraph (a) of this section, notwithstanding its ineptness, if they had capital, the income from which was subject to the excess profits tax provisions of the act. For in this connection it must be emphasized that the relation of invested capital and net income lies at the very base of what is excess profit. The government concedes that all the plaintiff's assets, over and above the legal reserve, are invested capital within the meaning of such section, and the Commissioner's determination that the plaintiff had $14,719,043.76 as invested capital is based on such concession. It insists, however, that this sum embraces all the assets of plaintiff that fit in with the terms of subdivision (3), par. (a), of that section, and that that is the only subdivision which could be made applicable to such company.

To my mind, the Commissioner's segregation of the plaintiff's assets into legal reserve and surplus is unsubstantial, and his determination that only the surplus constitutes the statutory "invested capital" is erroneous. Such a ruling, as pointed out by the plaintiff, would produce strange results. The company which kept its premiums closest to the mathematical computation of cost would have the smallest surplus—Commissioner's invested capital—the largest earnings pro rata, and pay the largest excess profits tax, while the company which secured the largest surplus through a liberal loading of the premiums would obtain the smallest earnings pro rata and pay the smallest excess profits tax. In the absence of compelling reasons, such an in-

congruous and inequitable result is not to be imputed to Congress. I fail to see how this so-called surplus of the plaintiff's assets may be held to be invested capital, as paid-in or earned surplus or undivided profits used or employed in the business, if the legal reserve is not. True, the legal reserve is required by law, while the other assets are not so required, and the company has less control over the disposition of the legal reserve than over its remaining assets. But these facts furnish no basis for excluding the former from, and including the latter in, "invested capital." Both have a common source, namely, premiums paid in by the policy holders and income derived from investments. So much of each of these classes of assets as represents premiums, is actual cash paid in to the insurance company by its members. These members—policy holders—are analogous to shareholders in a stock corporation. Subdivision (1), par. (a), of section 207 of the Revenue Act of 1917 is not expressly restricted to cash paid for shares of stock, and if mutual insurance companies are to be subjected to the imposition of war excess profits taxes, then by analogy so much of the premium payments made by such members, which is in excess of the actual cost of the insurance, should be held to come within such subdivision and be treated as "invested capital."

That Congress in the Revenue Act of 1918 amended this subdivision and expressly restricted it to cash paid in "for stock or shares" (section 326 [a] 1 [Comp. St. Ann. Supp. 1919, § 6336$^{7}$/$_{16}$i]) affords no reason for holding that subdivision (1), as it stood in the 1917 act, must be so limited when applied to mutual insurance corporations. This added limitation is a distinct legislative recognition that without it the cash contribution to capital would not be so restricted. However, if it be given a retroactive effect as a legislative construction of the act of 1917, as contended by the government, that would not prevent the application of the analogy just invoked. This subdivision would not then stand on the same basis as subdivision (2), admittedly inapplicable to the plaintiff, because this latter subdivision is further restricted to "tangible property," as the consideration given in payment for shares of capital stock, which does not find an equivalent or counterpart in any portion of the premiums paid by a member—policy holder—of a mutual life insurance company.

This reasoning by analogy in relation to subdivison (1) in principle is applicable to subdivision (3) of the same paragraph, which declares that the "paid in or earned surplus and undivided profits used or employed in the business" are invested capital. The surplus here referred to is not to be construed as meaning one and the same thing, namely, earned surplus paid in. This subdivision is in the alternative and includes paid-in surplus, whether earned in the business or not. It frequently happens that shareholders—members—of a stock corporation, to augment the capital beyond that paid for shares of stock issued, contribute cash to create a surplus fund. La Belle Iron Works v. United States, 256 U. S. 377, 389, 41 Sup. Ct. 528, 65 L. Ed. 998. While this, when so paid, is usually done at the beginning of the enterprise, there is nothing to prevent its being repeatedly done. The individual premiums paid by a policy holder of a mutual life insurance company, as already stated, being intentionally made larg-

er in amount than supposed to be necessary to defray the actual cost of insurance, it follows that they cover more than protection. Included therein is something for investment, differing radically in this respect from premiums paid for fire, marine, or casualty insurance. Penn Mutual Co. v. Lederer, 252 U. S. 523, 533, 534, 40 Sup. Ct. 397, 64 L. Ed. 698. This portion paid as investment is retained by the company, and so much thereof as is added to legal reserve so continues until the policy matures or is surrendered. No dividends are paid out of this reserve during the continuance of the life of the policy, but it is kept invested and reinvested to mature the outstanding policies. It, as well as its increment, inures to the benefit of the policy holders, and this reserve, at all times while in the possession of the company, is capital invested or held for investment. Therefore all that part of these premiums that is larger than necessary for cost insurance is, by analogy, paid in, either as capital or surplus, for the purpose of carrying on the insurance business in which the members are mutually engaged. As a part of these excess payments in premiums are carried into the legal reserve, at least so much of this reserve as represents redundant payments of premiums becomes capital or surplus and falls within subdivisions (1) or (3), or possibly both, and are as much "invested capital" as any cash paid for shares by shareholders of a stock corporation, or earned or paid-in surplus used and employed by such corporation in its business.

The legal reserve of the plaintiff had been accumulating for more than 60 years before the first of the herein mentioned federal Income Tax Acts was passed. These for the years beginning January 1st of each 1872, 1909, 1911, 1912, 1913, and 1917, and their proportion of premiums and interest derived from policy holders and investment of its reserve, respectively, are as follows:

| Year. | Premium. | Interest. | Total Reserve. |
|---|---|---|---|
| 1872 | $15,561,155.37 | $ 4,094,988.63 | $ 19,656,144.00 |
| 1909 | 33,569,867.14 | 76,554,892.93 | 110,124,750.07 |
| 1911 | 39,979,811.50 | 85,174,674.20 | 125,154,485.70 |
| 1912 | 45,591,484.45 | 89,872,590.70 | 135,464,075.15 |
| 1913 | 49,610,074.71 | 94,543,867.98 | 144,153,942.69 |
| 1917 | 70,302,157.10 | 115,956,638.90 | 186,258,796.00 |

These years have been selected for the following reasons: The New Jersey Legislature first required life insurance companies to maintain a legal reserve in the year 1872; in 1909 corporations were first subjected to a federal income tax; the years 1911, 1912 and 1913 constitute the pre-war period referred to in the act of October 3, 1917, and which years that act (section 200) declared to be the standard for comparison in determining what was an excess profit subject to an excess profits tax; and the year 1917 is the taxable year in question.

Only since the passage of the act of August 5, 1909 (36 Stat. 112, c. 6), which imposed a federal excise tax on corporations, has the matter of deducting annual net additions to legal reserve from gross income become relevant as to the status of legal reserve in the matter of federal income taxes. Whether the net additions beginning with 1909, having been once deducted in ascertaining the net income subject to a federal income tax, may be included as invested capital un--

der the act of 1917, is not necessary for present determination. Such a situation does not exist as to the net additions made prior to 1909, for these additions, whatever their source, rendered no such service. At the beginning of that year the total legal reserve was the sum of $110,124,750.07, and the interest derived therefrom was subject to the federal income tax in that and subsequent years.

While, in my judgment, no part of the reserve can be said to be "assets," the income from which is not subject to the tax imposed by the act of October 3, 1917, or any of the other federal Income Tax Acts, certainly no part thereof, as it existed in the beginning of 1909, can be said to be that kind of assets. Surely at that time, though it had been built up from the income (premiums and interest) of the company, it had become transmuted into capital for investment, and there is nothing in the act of 1917 which excludes it from its definition of "invested capital." In this connection it should be noted that, of the total reserve held on January 1, 1909, the sum of $33,569,887.14 was contributed from premiums. While this contribution at one time was income, it was the aggregate of the overpayments of premiums, and became, as elsewhere noted, cash contribution by the members of the plaintiff, to be used and employed by it in its business of life insurance, and may, by analogy, without doing violence to the statutory definition referred to, be held to be "invested capital" when dealing with the excess profits tax provisions of the 1917 act.

Again, it should be noted that in the beginning of the year 1872— the year when the New Jersey statute first required the maintenance of a legal reserve—the reserve amounted to the sum of $19,656,144, which, added to the amount allowed by the Commissioner, viz. $14,-719,043.76, as invested capital, exceeds the sum of $25,500,000, an amount concededly sufficient to avoid the imposition of any excess profits tax for the year 1917. In thus reasoning I have not overlooked the efforts made by representatives of the mutual companies, including the plaintiff, before the United States Senate and House committees having charge of the revenue bills of 1917 and 1918, urging amendments which would exclude such companies from the excess profits tax provisions, or which would include the legal reserve as invested capital; nor am I unmindful of the absence of any of such provisions in the revenue acts of these years. One cannot be unimpressed with such efforts or the failure of these committees to accede thereto. However, as the committees made no report on these suggested amendments, we have no legislative views as to the merits of either proposition. Both these efforts by the representatives and the absence of any official recommendation by these committees on the subject of these suggested amendments afford a basis for contradictory inferences.

As to these efforts: One is left in doubt whether the companies' representatives were urging the amendments, because of the belief that without their insertion the legal reserve could not be treated as "invested capital," or to remove the basis for the interpretation given to these representatives by the Commissioner that under the terms of the bill legal reserve could not be considered as invested capital, which interpretation had been brought by them to the attention of these leg-

islative committees. Hearings before Senate Subcommittee on Finance, 64th Congress, 2d Session, on H. R. 20573, p. 52; also hearings before Committee on Ways and Means, House of Representatives, on Revenue Act of 1918, part I, pp. 791, 798, 802, 811.

As to the attitude of these committees: They may have concluded that this reserve should not be considered as part of such capital, or they may have been of the opinion that the terms of the bills, properly interpreted, were ample to give it that status. The record of these hearings shows that several members of the Senate committee doubted that these excess profits tax provisions as drawn (and subsequently enacted) affected mutual life insurance companies, and that at least one of them doubted the soundness of the referred to interpretation of the Commissioner. Hearings before Senate Committee, pp. 52, 53.

In considering this phase of the question, it must be kept in mind that under title 2 of this bill, to which these suggested amendments were directed, Congress was reaching out for the large, if not inordinate, gains that had been made by many of the manufacturing and trading companies by reason of the war. In the Finance Committee's report to the Senate, in relation to this bill, it was stated that these gains amounted to nearly $3,000,000,000 in 1916, and that they were expected to be further increased in 1917. It is not improbable that these committees may well have shared the general belief that life insurance conducted on the mutual plan could not make these gains, and therefore would not be affected by the proposed excess profits tax.

[4] However, irrespective of which of these differing inferences be drawn from these occurrences before the congressional committees when these prospective acts were before them for hearing and consideration, it is well settled that, in the absence of formal reports from committees, explanatory of certain provisions of such acts, the meaning thereof is not to be determined from the debates in Congress pending their passage. United States v. Union Pacific R. R. Co., 91 U. S. 72, 23 L. Ed. 224; United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088; Binns v. United States, 194 U. S. 486. 24 Sup. Ct. 816, 48 L. Ed. 1087; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Penna. R. R. Co. v. International Coal Co., 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Omaha Street Ry. Co. v. Interstate Commerce Commission, 230 U. S. 324, 33 Sup. Ct. 890, 57 L. Ed. 1501, 46 L. R. A. (N. S.) 385; Lapina v. Williams, 232 U. S. 78, 34 Sup. Ct. 196, 58 L. Ed. 515; Duplex Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Russell Co. v. United States, 261 U. S. 515, 43 Sup. Ct. 428, 67 L. Ed. 778. A fortiorari this must be so as to discussions before a congressional committee, where no report is made in regard thereto.

Penn Mutual Life Ins. Co. v. Lederer, 252 U. S. 523, 40 Sup. Ct. 397, 64 L. Ed. 698, is not authority for a contrary canon of interpretation. The marginal reference (page 534) to briefs and statements filed with the Senate Committee was merely to show that the alleged unwisdom and injustice of excluding one class of corporations from

a tax exemption clearly and deliberately allowed to another class had been strongly pressed upon Congress. The later cases of Duplex Co. v. Deering, supra, and Russell Co. v. United States, supra, reiterate the rule above stated.

In my opinion, the plaintiff, at the beginning of the year 1917, had invested capital, within the meaning of the Revenue Act of October 3, 1917, exceeding the sum of $25,500,000. As it is conceded that, if such capital reached that sum, no war excess profits tax was due from the plaintiff for the year 1917, the motion to dismiss the plaintiff's complaint must be denied, and, under the stipulation between the parties, the plaintiff is entitled to judgment for the amount claimed.