THE MUTUAL FIRE, MARINE AND INLAND INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7459. Promulgated June 19, 1947.

*J. C. Peacock, Esq., Paul F. Myers, Esq.,* and *Morse Garwood, Esq.,* for the petitioner.

*William D. Harris, Esq.,* for the respondent.

1214

**OPINION.**

Arnold, *Judge*: The petitioner contends, first, that it was a mutual insurance company exempt from income tax under section 101 (11) of the Internal Revenue Code,[1] or, if not so exempt, that it was a mutual

---

[1] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this chapter.—* * *

* * * * * * *

(11) Farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses or expenses.

insurance company entitled under section 207 (c) (3) of the code [2] to deduct the premium deposits returned to its policyholders and the premium deposits retained by it for the payment of losses, expenses, and reinsurance reserves, and that after such deductions it had no taxable income.

The petitioner filed corporation income and excess profits tax returns for the taxable years showing no tax due, and also applied for and claimed exemption under section 101 (11) of the code. The respondent contends that the petitioner was not a mutual insurance company exempt under section 101 (11) because it accumulated a surplus which, in comparison with losses, was unnecessarily large.

A mutual insurance company is an association of persons having the object of obtaining insurance at cost. *Keystone Mutual Casualty Co.* v. *Driscoll,* 44 Fed. Supp. 658; affd., 137 Fed. (2d) 907.

Among the characteristics of such an organization are the common equitable ownership of the assets by the members, which may at their option be transferred into legal title and reduced to possession by the dissolution of the company; the right of all policyholders to be members to the exclusion of other persons and to choose the management; the conduct of the business to the sole end that the cost of the insurance be reduced; and the right of the members to a return of the premiums paid in excess of the amounts necessary to cover losses and expenses. It has been said that such a company is not in business or trade in the ordinary acceptance of these terms, and exists, not for profit, but solely to reduce the cost of insurance to its members. *Mutual Benefit Life Ins. Co.* v. *Duffy,* 295 Fed. 881; affd. (C. C. A., 3d Cir.), 3 Fed. (2d) 1020. In practice the premiums are made larger than the estimated bare cost, furnishing a guaranty fund out of which extraordinary losses may be met, and the excess is returned to the members, not as profits, but as a refund of overpayments. *Penn Mutual Life Ins. Co.* v. *Lederer,* 252 U. S. 523; *Mutual Benefit Life Ins. Co.* v. *Herold,* 198 Fed. 199; affd. (C. C. A., 3d Cir.), 201 Fed. 918.

The petitioner was organized under Pennsylvania law as a mutual fire insurance company. Each policyholder was a member, with the

---

[2] SEC. 207. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE.

(a) IMPOSITION OF TAX.—

(1) IN GENERAL.—There shall be levied, collected, and paid for each taxable year upon the special class net income of every mutual insurance company (other than a life insurance company) a tax equal to 16½ per centum thereof.

\* \* \* \* \*

(c) DEDUCTIONS.—In addition to the deductions allowed to corporations by section 23 the following deductions to insurance companies shall also be allowed, unless otherwise allowed—

\* \* \* \* \* \*

(3) MUTUAL INSURANCE COMPANIES OTHER THAN LIFE AND MARINE.—In the case of mutual insurance companies (including interinsurers and reciprocal underwriters, but not including mutual life or mutual marine insurance companies) requiring their members to make premium deposits to provide for losses and expenses, the amount of premium deposits returned to their policyholders and the amount of premium deposits retained for the payment of losses, expenses, and reinsurance reserves.

right to vote and was subject to assessment if necessary to meet losses and expenses. No other persons had voting rights. The petitioner did not insure nonmembers. A part of the gross premiums paid was returned to the members. These facts, we think, sufficiently show that the petitioner was a mutual insurance company. See *Safeguard Mutual Fire Insurance Co.*, 4 T. C. 75, p. 84.

This leads to the question whether the petitioner is entitled to exemption under section 101 (11) as a mutual insurance company "the income of which is used or held for the purpose of paying losses or expenses."

The respondent says that the issue depends largely upon the petitioner's method of operation and contends that the accumulation of surplus in comparison with the losses sustained indicates that the company is not exempt under section 101 (11). The surplus, amounting to about two and one-half million dollars, was in excess of the net losses paid by the petitioner in the 10 years ended with 1941. For the three years 1939, 1940, and 1941, the petitioner's expenses were about $700,000 and the net losses about $845,000. The gross losses were about $1,535,000 and reinsurance collections about $680,000. The surplus was about five times the average of the expenses and net losses for those years.

In *Keystone Mutual Casualty Co.* v. *Driscoll, supra*, the Circuit Court of Appeals for the Third Circuit quoted with approval the statement of the District Court that the consensus of the opinions of the courts construing the statute exempting mutual insurance companies is that the provision contemplates an association of persons "whose sole object is to obtain insurance for themselves at cost, and, if amounts greater than necessary cost had been collected, that excess was to be returned to members in some form. *The maintenance of a reasonable reserve is not prohibited, but it must be for the one purpose of paying losses and expenses*, with ultimate return of excess to members. In other words the association is for the benefit of the members, and not the members for the benefit of the association." (Emphasis supplied.)

The petitioner says that the surplus was retained for the purpose of paying losses and expenses, and that the amount was reasonable and in fact was not large enough to be a satisfactory guaranty fund for meeting extrordinary losses.

The president of the petitioner testified that practically all the insurance written by the petitioner was on railroad property and equipment and on goods in transit, that the petitioner fixed its own rates, that they were cost rates, that the reinsurers accepted these rates; and that the surplus was accumulated and was held entirely for the payment of losses and expenses. He considered the surplus less than a

reasonable reserve, and explained that, when the petitioner issued a policy of over three million dollars covering the Chicago Union Station, the bank holding a mortgage on the property questioned the adequacy of the insuring company's surplus, since it was less than the face amount of the policy, and that the policy was accepted only after the Pennsylvania Railroad, a proprietary member of the Chicago Union Station, had in effect guaranteed the policy. While part of the larger risks was reinsured, he explained that the petitioner, as a mutual, could not procure reinsurance in the large stock companies. He pointed out that reinsurance is not invariably collectible, as a re-insuring company might fail in the event of a large conflagration, and that the petitioner remains primarily liable to the policyholder for the entire amount of any risk underwritten, even though reinsuring a part of it.

In *Mutual Fire Insurance Co. of Germantown* v. *United States*, 142 Fed. (2d) 344; certiorari denied, 323 U. S. 729, the company charged the same rates as stock companies. During the five years 1934 to 1938, inclusive, the results of the company's underwriting ranged from a net profit of $17,656.02 to a loss of $11,436.68, and its net income from investments ranged from $114,850.59 to $80,435.46, the average annual combined net income from both sources being $95,793.80. The company's surplus or contingent fund was $2,800,000 at the beginning of 1934 and increased to $3,156,049.07 at the end of 1938. The only distribution made to its members was in 1873. The Circuit Court of Appeals for the Third Circuit held that the company was not a mutual insurance company within the purport of the revenue act, because the members were not receiving insurance at any figure approximating cost, since no redundancy payments were made to the members in spite of the considerable net gains from underwriting and from investment income. The court also said that the members did not have equitable ownership of the assets, since upon dissolution any balance remaining above the unearned premiums last paid would escheat to the Commonwealth of Pennsylvania, pursuant to section 677 of Purdon's Pennsylvania Statutes.

In *MacLaughlin* v. *Philadelphia Contributionship for the Insurance of Houses from Loss by Fire*, 73 Fed. (2d) 582; certiorari denied, 294 U. S. 718, the issue was whether the company, a mutual fire insurance company, was exempt from income tax by virtue of section 231 (11) of the Revenue Act of 1926 (identical with section 101 (11) of the code, *supra*.) The company issued perpetual contracts for a single premium deposit, at least 90 per cent of which was returned on cancellation. It distributed annually to those who had held policies for 10 years or more sums equal to 10 per cent of their premium deposits. At the end of 1925 and 1926, the company held premium deposits of $1,149,035.74

and $1,198,251.14 respectively, its surplus exceeded $8,000,000; its investment income was between $150,000 and $200,000 annually; and its insurance in effect was about $45,000,000. The Circuit Court of Appeals for the Third Circuit denied the exemption, saying the exemption was intended to apply only to those mutual insurance companies whose sole purpose is to provide protection for its members at cost, that the cost in such cases is defrayed by assessments or payments in order to meet losses and expenses and consideration of profits is never involved, and that the taxpayer did not qualify because its income was used and held, not only for paying losses and expenses, but also for investment for the benefit of its members, whereby it earned large profits for them in addition to providing low cost insurance.

While a mutual insurance company may maintain a reasonable reserve, provided it is held for the sole purpose of paying losses or expenses, the foregoing decisions establish that a reserve held for the purpose of making profits on investments is not held for paying losses or expenses and that the accumulation of a large surplus without return of any excess premiums to members is not furnishing insurance at cost. The making of a distribution, or the omission to distribute, is not conclusive, as there may be good reasons for refraining for a time to distribute, as in *Order of Railway Employees*, 2 T. C. 607 (petition to review dismissed, 143 Fed. (2d) 597), or the payment may take the character of a distribution of profits rather than a rebate of premiums, as in the case of the *Philadelphia Contributionship*, *etc., supra.* Also, the use of high premium rates would enable a company to make rebates, while the use of low rates might make this impracticable, in either case the insurance being furnished at cost.

The essential question here is whether the petitioner's accumulated reserve was reasonable and was held for the purpose of paying losses or expenses. It is true that substantial investment income accrued to the petitioner, but this of itself is not fatal, as any reasonable surplus should be invested rather than be kept idle.

The question of what reserve is reasonable was considered in *Baltimore Equitable Society* v. *United States*, 3 Fed. Supp. 427. As a result of the Baltimore fire of 1904, the society had adjusted 445 claims, amounting to $1,904,811.89, and its reserved surplus was depleted from $2,341,465 at the end of 1903 to $489,229.81 after the fire. In the years 1925 to 1928 the society had insurance in effect amounting to about sixteen to eighteen million dollars, and its surplus was $1,336,482.57 at the end of 1924 and increased to $1,719,610.64 at the end of 1938. The society had paid no rebates to policyholders. The Court of Claims said:

\* \* \* The defendant contends that this surplus was larger than was necessary to pay the ordinary losses and expenses of the company. The plaintiff

practically admits this, but argues in effect that under the circumstances of the case no more is carried than would be dictated by ordinary prudence. The evidence shows that the company limits its risk to buildings in the city of Baltimore, which undoubtedly enhances the amount which it might in event of an extensive fire be called upon to pay. The company was in existence at the time of the great Baltimore fire which so largely depleted its surplus that it needed to be increased and built up. It is now contended that the company carries no more than is proper in view of the fact that such a fire might recur. As we view the situation, while it is not likely that there will be another such great conflagration it is quite possible. Defendant calls attention to the fact that the surplus is increasing somewhat each year, but we do not think that this shows that it is not held for the purpose of paying losses or expenses. The only other disposition that could be made of it is to distribute a certain portion thereof to the stockholders, for which provision has been made by a resolution adopted providing that if at any time the "reserved surplus" should amount to a sum equal to 10 per cent of the total amount of the risks assumed by the plaintiff, plus $60,000, such excess should be distributed among the members as a dividend; but no dividend has ever been paid. We doubt whether the word "dividend" is proper as applied to such a distribution. Certainly it would not be a distribution of any profits but merely a return to the members of amounts collected which were in excess of the amount necessary to meet losses and expenses. The distribution is made when it is determined that it is no longer necessary to hold these amounts to pay losses and expenses; and if a larger amount was accumulated than necessary or held longer than necessary the purpose of the accumulation was to pay losses and expenses therewith, and the action of the association in accumulating more than was necessary or holding the accumulations longer than was necessary was merely an error in judgment and does not affect the purpose and object in view.

We think the reasonableness of the reserve in this situation is a matter of proportion, rather than size, and that the amount of the risks underwritten is a primary factor in the determination. While loss experience may be of considerable value, the hazard of unusual losses which might result from large disasters must also be given weight in estimating the amount which may reasonably be withheld from present distribution to the policyholders of a mutual fire insurance company. In the case of *Philadelphia Contributionship, etc., supra,* the surplus of eight million dollars was about 18 per cent of the insurance in force of about forty-five million dollars. This surplus was in addition to the premium deposits of over one million dollars calculated to cover all normal losses. In the case of the *Mutual Fire Insurance Co. of Germantown, supra,* the District Court (50 Fed. Supp. 665) pointed out that, although the company was in the business of insuring against loss by fire, the greater part of its gross income came from investments and rentals, the proportions for 1938 being 71 per cent from investments and rentals as against 29 per cent from underwriting gross income. The company had insurance in effect amounting to about fifty million dollars, its surplus was about three million dollars, and its earned premiums for 1938 were about fifty thousand dol-

lars. The surplus was about 6 per cent of the insurance in effect and about sixty times the earned premiums for the year. In contrast, the petitioner herein during the years 1939, 1940, and 1941 had earned premiums averaging about $475,000 per annum and investment income averaging about $114,000 per annum. The investment gross income was approximately 20 per cent of the total. Sixty times the earned premiums would be $28,500,000 and 6 per cent of the insurance in effect would be $24,000,000. If the petitioner's surplus approached these figures we could well accept the cited case as controlling here, but, since the surplus is about one-tenth of these amounts, we think the present case is distinguishable. In *Baltimore Equitable Society* v. *United States, supra,* where the surplus amounted to some 9 per cent of the insurance in effect, the Court of Claims did not consider the accumulation so unreasonable as to warrant denial of the exemption on that ground. A statute of Massachusetts (Annotated Laws, C. 175, sec. 80) authorizes mutual fire insurance companies to accumulate and hold profits until such profits equal 4 per cent of the insurance in force. In *White Fuel Corporations* v. *Liberty Mutual Insurance Co.,* 46 N. E. (2d) 548, it was said that, while this provision was a deliberate departure from the original conception of mutual insurance, it may well have been thought necessary in order to give stability and continuity to mutual companies and thus to assist the mutual principle as a whole to survive in the insurance business.

In the instant case the surplus was approximately two and one-half million dollars, while the insurance in force was in excess of three hundred seventy million dollars and in 1941 came to exceed four hundred million dollars. Upon a percentage basis, the surplus in the taxable years ranged between .6 and .7 of 1 per cent of the amount of insurance in force. A part of this insurance was reinsured, but the exact amount of the net risk has not been stated. The gross losses paid in 1939, 1940, and 1941 were about $1,525,000, of which the petitioner paid $845,000 and its reinsurers $680,000; the petitioner's share being 55 per cent. The total amount at risk in those years ranged from 375 million to 433 million dollars. On the assumption that the petitioner had retained only 55 per cent of the total risks, the petitioner's share ranged from 207 million to 238 million dollars. The surplus was between 1.1 and 1.2 per cent of this net risk. Although the surplus was increased by some $380,000 in those years, the insurance in effect increased by nearly sixty million dollars, the percentage of increase being practically the same.

The respondent contends that this surplus is too large; the petitioner considers it insufficient. We must determine whether this accumulation has reached the point where it is held, not for the purpose of paying losses or expenses, but for the benefit of the makers as an investment

for profit, as in the case of *Philadelphia Contributionship, etc., supra.* There is no other purpose for which it might properly be held. Ultimately it belongs to the members and is distributable among them. The surplus of a mutual fire insurance company forms a reserve for the protection of policyholders against extraordinary losses. Its distribution would remove or diminish this security and members would be deterred from taking or renewing policies if the funds retained on hand were only sufficient to cover present liabilities and an extensive fire might render the company insolvent. See *Greeff* v. *Equitable Life Assurance Society of the United States,* 160 N. Y. 19; 54 N. E. 712.

We do not agree with the respondent that the surplus, in proportion to the amount of insurance in effect, even considering reinsurance, is an excessive reserve. While it may appear large in comparison with actual losses, we think it is not unreasonable when possible losses in the event of a large conflagration are considered. We do not believe Congress intended that the exemption be limited to mutual insurance companies that did not safeguard their members against extraordinary losses. Furthermore, the petitioner's business was almost exclusively limited to risks involving railroads, railroad and related properties, stations, rolling stock, and goods in transit. Its board of directors is composed chiefly of railroad executives and counsel. Some of the risks assumed are in large amounts and it is to the interests of the members that the company retain sufficient reserves to permit the underwriting of large risks.

In the case of the *Mutual Fire Insurance Co. of Germantown, supra,* the court based its decision, in part, upon the conclusion that the policyholders did not have equitable ownership of the assets. The court referred to a Pennsylvania Act of May 25, 1921, which appears as section 677 of Purdon's Pennsylvania Statutes, and provides:

§ 677. Surplus held as reserves; disposition on dissolution.

The surplus of any domestic mutual fire insurance companies issuing policies in accordance with the provisions of section one or two of this act [Sections 675 and 676] shall be held as a reserve for the payment of losses and expenses; and, in the event of dissolution of the company, shall be divided pro rata among the policyholders whose policies are in force at the time of dissolution, but no policyholder, other than loss claimants, shall receive more than the amount of the unearned cash premium last paid to the company for the current term of such policy. Any balance remaining shall escheat to the Commonwealth of Pennsylvania.

Sections 675 and 676 refer by their terms solely to domestic mutual fire insurance companies organized prior to May 1, 1876, and authorize such companies under certain circumstances to issue policies for a cash premium without liability for assessment, or for a cash premium on which no dividend shall accrue. The petitioner was organized in 1902 and does not issue policies of the types described. Section 677 has no

apparent application to the petitioner. While the bylaws of the petitioner make no provision with respect to the rights of former members to share in the assets on final dissolution, the petitioner's status as a mutual is not thereby affected. *Order of Railway Employees, supra,* pp. 616, 617.

We conclude that in the taxable years 1940 and 1941 the petitioner was a mutual fire insurance company the income of which was used or held for the purpose of paying losses or expenses and that it is exempt pursuant to section 101 (11) of the Internal Revenue Code.

Reviewed by the Court.

*Decision will be entered for the petitioner.*