*Decision will be entered under Rule 155.*

OKLAHOMA STATE UNION OF THE FARMERS EDUCATIONAL AND COOPERATIVE UNION OF AMERICA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4584–74. Filed August 1, 1977.

*Jon H. Trudgeon* and *Donald R. Philbin,* for the petitioner.
*Michael J. O'Brien,* for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| *Year* | *Deficiency* |
|---|---|
| 1970 | $312,290.59 |
| 1971 | 40,305.19 |

After a concession by petitioner regarding a short-term capital gain, the only issue remaining is whether petitioner was a mutual insurance company entitled to report its income pursuant to sections 821 through 826.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

The petitioner, Oklahoma State Union of the Farmers Educational and Cooperative Union of America (hereafter referred to as petitioner), is an unincorporated association whose principal office was located in Oklahoma City, Okla., at the time of the filing of the petition herein. Petitioner filed a United States Mutual Insurance Company Income Tax Return, Form 1120M, for each of the taxable years 1970 and

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

1971 with the Internal Revenue Service Center in Austin, Tex. For the years in issue, petitioner kept its books and filed its returns using the accrual method of accounting based upon a calendar year.

Petitioner operates under a charter issued March 23, 1906, to the Indiahoma State Union and under a charter issued October 11, 1920, to its successor by the National Farmers Union. Relevant excerpts from petitioner's bylaws are set out below:

ARTICLE I

* * *

PURPOSES

To function as a general farm organization, establish and issue charters to Local and County Unions.

To foster, promote and conduct agricultural education, legislation and research which will encourage and protect the family farm and the families on the land.

To foster, promote and teach the concept of cooperation and the cooperative movement among farmers.

To secure equity, establish justice and apply the Golden Rule.

To assist our members in buying and selling.

To secure and maintain profitable and uniform prices for farm products.

To strive for harmony and goodwill among all mankind, and brotherly love among ourselves; therefore be it remembered, that

THE OKLAHOMA STATE UNION OF THE FARMERS' EDUCATIONAL AND CO-OPERATIVE UNION OF AMERICA, generally known as the Oklahoma Farmers' Union and hereinafter referred to as the State Union, (having a charter issued to the Indiahoma State Union on the 23rd day of March, 1906, and a Charter issued to it as successor to the Indiahoma State Union on the 11th day of October, 1920, by the National Union), adopts the said foregoing purposes as its own. Because of the change of conditions in the intervening years, it is considered desirable and therefore included herein the following statement of principle and purpose:

1. To adopt programs calculated to promote better conditions for its members;

2. To operate, aid in the organization and maintenance of non-profit commodity and service cooperative for members thereof;

3. To distribute and disseminate information to farm families and especially to its members for carrying out a program of education in cooperation and cooperative philosophy generally and engage in such activities in carrying out its declared purposes and, if possible and practical, in a way that will entitle it, operating for its members, to exemption from the payment of income taxes as such organization, and,

4. To publish a newspaper which shall be identified as the Oklahoma Union Farmer.

ARTICLE II

OTHER POWERS AND REQUIREMENTS

*Section 1.* The State Union has a fraternal relationship with the National Union, but in its business activities, such as its Mutual Insurance Department, operated for its members only, is a non-stock, non-profit, mutual voluntary association operated for its members.

* * *

*Section 3.* The Farmers Union is especially designed to promote the general welfare of family type farmers and as set forth in the Articles of Incorporation of the National Union and the specific and general purposes hereinbefore enumerated and as hereinafter provided in these By-Laws, and as further set forth in its action program adopted annually by its State Convention. The State Union is not operated for pecuniary profits as such, but is operated for the savings it can make for its members and benefits to its members of an educational and fraternal nature. It is not its purpose to accumulate large assets for the direct benefit of members as such.

*Section 4.* In the event the assets of the State Union shall be liquidated, the following order shall be followed:

(a) Pay obligation to creditors in the order of priority thereof or security thereof as provided by law.

(b) Pay the dissolution or liquidation expense.

(c) The assets remaining shall be vested in trustees who shall be appointed by the State Board of the State Union. Trustees shall divide the residual assets and distribute them to the membership on the then determined percentage to the individual members based upon the indebtedness, if any, which might exist between an individual member and the Farmers Union at the time of said distribution.

* * *

ARTICLE VIII

BOARD OF DIRECTORS

*Section 1.* The Board of Directors shall be composed of seven (7) members elected for a term of three years or until their successors are chosen and qualified.

*Section 2.* The Board of Directors, subject to restrictions of law, or these By-Laws, shall exercise all of the powers of the State Union and perform all acts which said Board may deem in the best interest of the State Union and its members. The powers of the Board of Directors shall include, without limiting in any other way, other powers which said Board should have in accordance with the laws of the State of Oklahoma and the By-Laws of the State Union the power to sell, lease, mortgage or otherwise dispose of property of this Association and to perform all acts which said Board may deem in the best interests of its members.

* * *

## ARTICLE IX
### Officers

*Section 1.* The principal officers of this state division shall be the President, Vice President & Secretary-Treasurer.

*Section 2.* The President shall be elected annually by and at the State Convention held each year and shall hold office for a term of one (1) year and until his successor is elected and qualified. He shall be the Chief Executive Officer of the State Division. He shall preside at State Conventions. He shall have the power to appoint committees for the work of such conventions. He shall preside at all meetings of the Board of Directors. He may vote in case of a tie vote. He shall decide all questions concerning the By-Laws. He shall perform such other duties as may be required of him by the Board of Directors. He shall receive for his services a salary, the amount of which shall be determined and authorized by the Board of Directors. He shall be reimbursed for necessary expenses when away from home on the business of the State Division.

* * *

## ARTICLE XI
### Management

*Section 1.* Management of the State Union shall be by the President, under the supervision of the Executive Committee.

* * *

## ARTICLE XII
### Initiative and Referendum

The right of the initiative and referendum, the recall, and the imperative mandate shall not be denied the members of the Union.

Five percent (5%) of the membership may petition the President to submit to a referendum vote any measure, or ask the recall of any office, and upon receipt of such petition he shall submit the same to a referendum vote of the entire membership at such time and in such manner as may be directed by the By-Laws.

* * *

## ARTICLE XIV
### Business Activities Reserve and Dividends

*Section 1.* The business activities and operations of the Oklahoma State Union of the Farmers' Educational and Co-Operative Union of America shall be confined to the writing of insurance for its members, on properties located in the State of Oklahoma and as a mutual non-profit association and not operated for profit and the maintaining of its membership and information to be furnished for its members and other services of an educational nature are to be related to and incident to the said insurance business for its members. As part of the community life where it operates and to aid in promoting the general welfare it may perform such services as a mutual insurance organization may properly render and retain the most favorable income tax status as such organization.

*Section 2.* As near as possible, adequate rates shall be charged for insurance on properties of members to take care of losses and necessary overhead expenses, based on past experiences, and in the judgement of the executive officers, to maintain such reserve as will make its insurance sound and give security to its policyholders. Dividends may be declared out of earnings in excess of what may be deemed reasonable and proper in the conduct of said business and in excess of all liabilities or the rates charged for insurance may be reduced, it being the purpose of this organization to operate the said business on the mutual and non-profit basis. The amount of dividends declared, if any, shall not impair the needed reserve for said insurance and the amount of dividends which may be determined as fair and reasonable shall not be contingent upon the continuance of any of the insurance written by it. No insurance shall be written for non-members and non-members shall not participate in its profits, if any, and losses.

Petitioner began issuing insurance contracts to its members in 1921. While only members can purchase insurance from petitioner, not all members are policyholders. During the years in issue, approximately 8 percent of petitioner's members were not policyholders.

Petitioner's insurance business involved crop insurance, farm property or property insurance, and automobile insurance. The total property insurance in force in January 1972 was $563 million. Prior to 1959 petitioner did not underwrite the risk associated with the automobile casualty insurance which it sold. Petitioner made this type of coverage available to its members by writing policies issued by the National Farmers Union Property & Casualty Co. on a commission basis.

Petitioner is authorized to write insurance only in the State of Oklahoma. Petitioner is exempt, however, from the regulatory provisions of the Oklahoma Insurance Code. Okla. Stat. Ann. tit. 36, sec. 110 (6) (1958).[2]

Petitioner's net premium income, claims and claims expenses, increases in these amounts, and the ratio of claims and

---

[2] Sec. 110. Application as to particular types of insurers

No provision of this code shall apply with respect to:

* * *

6. Any domestic association organized under the supervision or by authority of any legally incorporated Grange Order of Patrons of Husbandry or to The Oklahoma State Union of the Farmers' Educational and Co-operative Union of America, when such association is formed for the mutual benefit of the members of such order or orders exclusively;

claims expenses to net premium income for each of the years 1958 through 1974 were as follows:

| Year | Net premium | Percentage increase | Claims and claims expenses | Percentage increase | Loss ratio |
|---|---|---|---|---|---|
| 1958 | $1,696,819.67 | | (1) | | |
| 1959 | 1,698,277.80 | .1 | [1]$1,097,906.76 | | 64.6 |
| 1960 | 2,116,879.24 | 24.6 | 1,598,758.71 | 45.6 | 75.5 |
| 1961 | 2,321,421.81 | 9.7 | 1,695,083.09 | 6.0 | 73.0 |
| 1962 | 2,609,262.18 | 12.4 | 1,697,166.92 | .1 | 65.0 |
| 1963 | 2,539,723.83 | (2.7) | 1,020,069.63 | (39.9) | 40.1 |
| 1964 | 2,624,005.80 | 3.3 | 1,340,972.52 | 31.5 | 51.1 |
| 1964[2] | 208,022.58 | | 104,333.82 | | 50.1 |
| 1965 | 2,869,979.18 | 9.4 | 1,333,742.06 | (.6) | 46.4 |
| 1966 | 3,046,552.92 | 6.1 | 1,175,986.54 | (11.9) | 38.6 |
| 1967 | 4,797,696.82 | 57.5 | 3,071,077.54 | 161.1 | 64.0 |
| 1968 | 5,539,533.62 | 15.4 | 3,585,111.09 | 16.3 | 64.7 |
| 1969 | 5,915,413.11 | 6.8 | 3,704,746.18 | 3.3 | 62.6 |
| 1970 | 6,547,926.73 | 10.6 | 4,436,808.09 | 19.8 | 67.7 |
| 1971 | 7,737,196.60 | 18.2 | 5,140,775.35 | 15.9 | 66.4 |
| 1972 | 8,858,455.64 | 14.5 | 5,559,596.39 | 8.1 | 62.7 |
| 1973 | 10,292,909.09 | 16.2 | 6,959,245.18 | 25.2 | 67.6 |
| 1974 | 10,474,883.26 | 1.8 | 7,824,071.31 | 12.4 | 74.6 |

[1] There are no figures available for automobile claims in 1958.
[2] This reflects only a 1-month period (12/1—12/31) due to a change in the accounting year.

Petitioner's operating and administrative expenses and the ratio of such expenses to net premium income for each of the years 1958 through 1974 were as follows:

| Year | Operating and administrative expense | Net premiums | Ratio |
|---|---|---|---|
| 1958 | $529,286.51 | [1]$1,236,775.04 | 42.8 |
| 1959 | 584,518.84 | 1,698,277.80 | 34.4 |
| 1960 | 724,553.63 | 2,116,879.24 | 34.2 |
| 1961 | 851,493.91 | 2,321,421.81 | 36.7 |
| 1962 | 859,247.79 | 2,609,262.18 | 33.0 |
| 1963 | 1,003,221.26 | 2,539,723.83 | 40.0 |
| 1964 | 1,115,763.06 | 2,624,005.80 | 42.5 |
| 1964[2] | 155,811.41 | 208,022.58 | 75.0 |
| 1965 | 1,261,529.02 | 2,869,979.18 | 44.0 |
| 1966 | 1,358,014.79 | 3,046,552.92 | 44.6 |
| 1967 | 1,471,831.59 | 4,797,696.82 | 30.7 |
| 1968 | 1,623,402.99 | 5,539,533.62 | 29.3 |
| 1969 | 2,201,603.38 | 5,915,413.11 | 37.2 |
| 1970 | 2,358,610.66 | 6,547,926.73 | 36.0 |
| 1971 | 2,712,921.34 | 7,737,196.60 | 35.1 |
| 1972 | 3,102,840.86 | 8,858,455.64 | 35.0 |
| 1973 | 3,500,120.93 | 10,292,909.09 | 34.0 |
| 1974 | 3,482,451.90 | 10,474,883.26 | 33.2 |

[1] The net premium figures on this table and the preceding and following tables were stipulated to by the parties. We note that there is a discrepancy for the year 1958 between this table and the preceding and following tables which is not explained. This discrepancy does not affect our decision.
[2] This reflects only a 1-month period.

The National Association of Insurance Commissioners (NAIC), an organization composed of the chief insurance regulatory personnel in various States, has developed an early warning system for the purpose of providing assistance in identifying insurance companies which may be financially unsound. The system is based on several tests which have been shown to be effective in distinguishing between financially troubled and financially sound companies. One such test is the ratio of net premium to surplus. According to the NAIC the ratio of net premium to surplus measures the adequacy of surplus. The higher the ratio, the more risk the company bears in relation to the surplus available to absorb above-average losses. The usual range for the ratio of net premium to surplus in financially sound companies is up to 3 to 1.

The following chart sets forth petitioner's policyholder surplus, net premiums, and the ratio of net premiums to policyholder surplus for each of the years 1958 through 1974:

| *Year* | *Policyholder surplus* | *Increase in policyholder surplus* | *Net premiums* | *Ratio of net premiums to policyholder surplus* |
|---|---|---|---|---|
| 1958 | $1,171,597.10 | 29.9% | $1,236,775.04 | 1.44 to 1 |
| 1959 | 1,338,910.56 | 14.3% | 1,698,277.80 | 1.27 to 1 |
| 1960 | 1,221,616.80 | -8.8% | 2,116,879.24 | 1.73 to 1 |
| 1961 | 1,103,766.43 | -9.6% | 2,321,421.81 | 2.10 to 1 |
| 1962 | 1,241,962.08 | 11.3% | 2,609,262.18 | 2.10 to 1 |
| 1963 | 1,802,942.42 | 45.2% | 2,539,723.83 | 1.41 to 1 |
| 1964[1] | 1,830,071.74 | 0.6% | 2,624,005.80 | 1.40 to 1 |
| 1965 | 2,205,247.95 | 20.5% | 2,869,979.18 | 1.30 to 1 |
| 1966 | 2,683,159.49 | 21.7% | 3,046,552.92 | 1.13 to 1 |
| 1967 | 2,797,540.36 | 4.3% | 4,797,696.82 | 1.72 to 1 |
| 1968 | 3,217,985.86 | 15.0% | 5,539,533.62 | 1.72 to 1 |
| 1969 | 3,382,225.84 | 5.1% | 5,915,413.11 | 1.74 to 1 |
| 1970 | 3,697,040.43 | 9.3% | 6,547,926.73 | 1.77 to 1 |
| 1971 | 4,361,297.44 | 18.0% | 7,737,196.60 | 1.77 to 1 |
| 1972 | 5,280,816.06 | 21.1% | 8,858,455.64 | 1.67 to 1 |
| 1973 | 6,161,864.98 | 11.6% | 10,292,909.09 | 1.67 to 1 |
| 1974 | 6,537,455.34 | 6.1% | 10,474,883.26 | 1.60 to 1 |

[1] Short period of 1 month omitted.

During the years 1938 through 1974, petitioner paid dividends as follows:

| Year | Amount | Year | Amount | Year | Amount | Year | Amount |
|---|---|---|---|---|---|---|---|
| 1938.......... | $1,646.73 | 1947.......... | 0 | 1956.......... | 0 | 1965.......... | 0 |
| 1939.......... | 1,297.00 | 1948.......... | 0 | 1957.......... | 0 | 1966.......... | 0 |
| 1940.......... | 1,315.77 | 1949.......... | 0 | 1958.......... | 0 | 1967.......... | 0 |
| 1941.......... | 1,383.64 | 1950.......... | 0 | 1959.......... | 0 | 1968.......... | 0 |
| 1942.......... | 44.77 | 1951.......... | 0 | 1960.......... | 0 | 1969.......... | 0 |
| 1943.......... | 0 | 1952.......... | 0 | 1961.......... | 0 | 1970.......... | 0 |
| 1944.......... | 0 | 1953.......... | 0 | 1962.......... | 0 | 1971.......... | 0 |
| 1945.......... | 0 | 1954.......... | 0 | 1963.......... | 0 | 1972.......... | 0 |
| 1946.......... | 0 | 1955.......... | $10,016.39 | 1964.......... | 0 | 1973.......... | [1]$136,768.08 |
| | | | | | | 1974.......... | 137,838.00 |

[1] The dividends in 1973 and 1974 were in the form of accidental death benefit insurance purchased by petitioner for each of its members.

Since 1952, petitioner has been a member of the Farmers Union Reinsurance Pool (hereafter the pool). Members of the pool entered into a series of agreements with respect to property coverages on risks written by each member under fire policies, homeowner policies, farmowner policies, and any special insurance policies designed specifically to cover farm or dwelling property. All property insurance policies written by petitioner covering farm or dwelling property were subject to at least part of the reinsurance pool agreement. The protection afforded by the agreement as to each policy was subject to retention limits for both single losses and aggregate losses on all policies and upper limitations on both single and aggregate losses.

Under the "single risk—single occurrence" section of the pool agreement, petitioner's retained liability for a loss from a single occurrence was $10,000 plus 10 percent of the amount of the loss in excess of $10,000. The pool assumed the risk for 90 percent of the loss from each such occurrence in excess of $10,000 subject to a limit of $81,000 (90 percent of $90,000). Petitioner remained liable for that portion of the loss in excess of $100,000. For this participation in the pool petitioner was required to make a monthly payment, the amount of which was calculated as follows:

> Petitioner's reinsurance recoveries under the "single risk—single occurrence" portion of the pool agreement for the immediately preceding five years multiplied by 1.25, divided by 60

Also, if in any year petitioner's aggregate losses exceeded 65 percent of its net premiums for that year, it could recover from the pool 90 percent of such excess subject to a maximum

recovery of $150,000.[3] For this participation in the pool petitioner was required to make a monthly payment, the amount of which was calculated as follows:

> Petitioner's recoveries under the aggregate excess reinsurance portion of the agreement for the immediately preceding five years multiplied by 1.25, divided by 60

Thus, participation in the pool enabled petitioner to lessen the impact of some of its losses in any one year by spreading the effect of such losses over a 5-year period.

During the years 1959 through 1971 petitioner reinsured a portion of its risk with respect to hail crop insurance and auto casualty insurance.[4] According to petitioner's annual reports, gross premiums, premiums ceded to reinsurers, and reinsurance commissions received with respect to such insurance were as set forth in table on page 660.

Petitioner was limited by statute to writing insurance for individuals. In 1960 petitioner organized a stock insurance company, the Oklahoma Farmers Union Insurance Co., which could write policies on properties owned by businesses, churches, schools, and the like. Petitioner contributed $390,760 in exchange for all the capital stock of such company. Only one dividend had been paid on this stock during the period extending from 1960 to the time of trial.

In the mid-1960's petitioner became involved in the formation of a life insurance company, known as the Farmers & Ranchers Life Insurance Co. By the end of 1969, petitioner owned all the stock of the life insurance company and had made a total investment in such company of $398,810.62.

In the early 1950's petitioner invested a total of $207,300 in the Oklahoma Farmers Union Cooperative, which was in the seed, grain, and general feed mill business. Petitioner's investment was represented by preferred stock with a maximum dividend-paying capacity of 4 percent. This invest-

---

[3] Under the "second aggregate excess reinsurance" portion of the agreement petitioner was entitled to indemnification for 90 percent of its aggregate loss in excess of $150,000, subject to a limit of $200,000.

[4] The Court has not been provided with any details regarding the reinsurance arrangements for these types of policies, except that Lloyds of London served as the principal reinsurer for hail crop insurance written by petitioner.

Gross Premiums, Premiums Ceded to Reinsurers, and Reinsurance Commissions
(According to Petitioner's Annual Reports)

| *Year*[1] | *Gross premium written* | *Premium ceded to reinsurer* | *Reinsurance commission on business ceded* |
|---|---|---|---|
| | HAIL CROP | | |
| 1959 | $311,963.63 | $114,628.19 | $27,623.44 |
| 1960 | 406,492.42 | 283,885.33 | 79,200.00 |
| 1961 | 448,694.03 | 322,860.52 | 90,153.80 |
| 1962 | 380,761.59 | 273,051.54 | 72,390.43 |
| 1963 | 340,986.71 | 246,102.89 | 62,696.32 |
| 1964 | 352,812.25 | 260,035.85 | 67,851.62 |
| 1964[2] | 0 | 0 | 0 |
| 1965[3] | 431,463.33 | 318,220.53 | 80,813.94 |
| 1966 | [4]292,266.48 | 214,143.11 | 54,869.44 |
| 1967 | 213,739.76 | 149,277.57 | 38,187.29 |
| 1968 | 391,742.24 | 284,571.87 | 72,860.12 |
| 1969 | 281,798.17 | 243,788.48 | 73,743.55 |
| 1970 | 260,800.38 | 225,286.90 | 79,046.87 |
| 1971 | 108,769.52 | 92,990.57 | 29,109.27 |
| | AUTO CASUALTY | | |
| 1959 | 672,916.49 | 532,180.32 | 122,047.85 |
| 1960 | 1,335,058.33 | 1,071,827.87 | 288,490.29 |
| 1961 | 1,588,089.68 | 1,275,055.80 | 320,221.85 |
| 1962 | 1,771,325.85 | 1,422,116.14 | 468,870.93 |
| 1963 | 1,668,031.18 | 1,339,640.94 | 362,805.81 |
| 1964 | 1,720,695.90 | 1,383,617.82 | 375,597.20 |
| 1964[2] | 105,430.20 | 84,601.16 | 22,945.11 |
| 1965[3] | 2,032,505.58 | 1,635,218.83 | 443,436.25 |
| 1966 | 2,108,980.22 | 1,692,097.48 | 459,194.10 |
| 1967 | 2,595,764.61 | 128,738.13 | 76,355.17 |
| 1968 | 2,801,578.86 | 115,928.23 | 40,574.89 |
| 1969 | 3,219,867.90 | 132,628.66 | 50,746.82 |
| 1970 | 3,739,082.33 | 145,601.43 | 50,840.97 |
| 1971 | 4,990,681.02 | 184,869.05 | (Figure not available) |

[1] Until 1965, petitioner was on a fiscal year ending Nov. 30.

[2] These figures are for the short period of Dec. 1, 1964, to Dec. 31, 1964.

[3] Beginning in 1965, the figures are based on the calendar year.

[4] Petitioner's annual reports for 1966 and thereafter refer to "net premium receipts," rather than to "gross premiums written."

ment is still carried on petitioner's books and there is little or no likelihood of its ever being recovered.

For many years petitioner has also been closely associated with the Oklahoma Farmers Union Supply Association (Supply). Although Supply had at one time been engaged in the sale of various products, its business during the years in issue was limited to the sale of automobile tires at wholesale prices to petitioner's members. Supply occupied premises which had either been purchased or constructed by petitioner and which were then leased to Supply. During the years in issue Supply's tire inventory actually belonged to Tire Warehouse, Inc., of Waco, Tex. In 1971, petitioner's board of directors authorized a loan of $100,000 to Tire Warehouse, Inc., at 9-percent interest which was secured by a mortgage in petitioner's favor on the tire inventory. Although petitioner received a commission on all tire sales, the wholesale tire program was not a profitmaking venture, but rather was conducted as a service to petitioner's members.

Petitioner has taken considerable interest in legislation that would affect the farmer. Specific legislative proposals which have attracted petitioner's attention over the years have been concerned with homesteads, welfare, corporate farming, ad valorem property taxation, reapportionment of legislative districts, tax exemption for various farm products, and machinery and price support legislation. Although petitioner made a few rather modest financial contributions in this regard, its major efforts were directed more toward exerting its influence by "going on record" as either endorsing or opposing specific legislative proposals.

For many years petitioner has sponsored various educational programs for the benefit of its members. For instance, petitioner maintained a summer camp for youngsters, sponsored speech contests, and awarded scholarships.

Petitioner holds annual conventions which are attended by approximately 1,500 members, about one-half of whom are official delegates from the local and county unions. The delegates elect petitioner's directors and officers. These conventions are usually in session for two full days and about one-half day is devoted to a reading of the reports involving petitioner's insurance operations. The remaining time is devoted to discussion of various issues of general interest to

farmers. Petitioner reimburses the delegates for a portion of their expenses in connection with attendance at these conventions. Additionally, petitioner usually sponsors 15 or 20 delegates to a national convention of various farmers' groups which meet annually to discuss a wide variety of topics of interest to farmers.

Under petitioner's bylaws each member is required to pay annual dues of $4. Of this amount, petitioner is to receive $0.75; the National Farmers Union is to receive $2; the local and county unions are to receive $0.75; and $0.50 is to be allocated to the Oklahoma Union Farmer, a newspaper of general interest published by petitioner. Petitioner's income from membership dues is placed in its general fund and no attempt is made to specifically identify and match any of petitioner's expenses against such income. The information in the table on page 663 is derived from petitioner's audited financial statements.

## OPINION

The taxation of insurance companies is governed by subchapter L of the Internal Revenue Code of 1954. Life insurance companies are taxed in accordance with sections 801–820; mutual insurance companies are taxed in accordance with sections 821–826; and other insurance companies are taxed in accordance with sections 831–832. Petitioner reported its income for the years in issue as a mutual insurance company. Respondent has determined that petitioner was not a mutual insurance company and has adjusted petitioner's income accordingly. Thus, the only issue is whether petitioner was a mutual insurance company entitled to report its income in accordance with sections 821–826.

There is one preliminary matter which must be dealt with at this point. On October 14, 1975, petitioner filed a motion for summary judgment. Oral arguments were heard on November 3, 1975, and after due consideration petitioner's motion was denied. At the conclusion of the trial petitioner again moved for summary judgment and the motion was denied. At that point petitioner renewed its motion and requested that the Court take the motion under advisement. The respondent having no objection, petitioner's third motion for summary judgment was taken under advisement.

| | Fiscal Years | | | Calendar Years 1965–74 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *1962* | *1963* | *1964*[1] | *1965* | *1966* | *1967* | *1968* | *1969* | 1970 | *1971* | *1972* | *1973* | *1974* |
| 1. Membership income ......... | $101,566 | $93,705 | $101,172 | $137,125 | $146,176 | $155,942 | $162,267 | $172,875 | $181,746 | $202,651 | $218,417 | $228,852 | $202,056 |
| 2. National dues............. | 48,651 | 60,201 | 49,012 | 75,015 | 76,000 | 123,530 | 102,640 | 108,522 | 115,304 | 120,282 | 134,870 | 136,768 | 137,838 |
| 3. Educational expenses[2]..... | 18,062 | 18,698 | 20,270 | 22,253 | 23,059 | 21,616 | 26,392 | 29,194 | 22,215 | 25,819 | 18,150 | 15,659 | 19,538 |
| 4. National and State convention expenses ...... | 8,120 | 10,841 | 19,728 | 4,650 | 10,913 | 12,527 | 14,823 | 17,017 | 16,910 | 20,020 | 19,228 | 19,459 | 27,193 |
| 5. Union Farmer expense (newspaper). | 25,384 | 25,875 | 25,004 | 22,259 | 18,965 | 16,235 | 19,128 | 17,727 | 18,897 | 20,820 | 21,432 | 27,337 | 32,749 |
| 6. Total expense (lines 2, 3, 4, and 5)....... | 100,217 | 115,615 | 114,014 | 124,177 | 128,937 | 173,908 | 162,983 | 172,460 | 173,326 | 186,941 | 193,680 | 199,223 | 217,318 |
| 7. Line 1 less line 6........... | 1,349 | (21,910) | (12,842) | 12,948 | 17,239 | (17,966) | (716) | 415 | 8,420 | 15,710 | 24,737 | 29,629 | (15,262) |

[1] The figures for 1964 are for the 13-month pe[illegible] extending from Dec. 1, 1963, through Dec. 31, 1964.

[2] This includes amounts separately categorized in the financial statements as: educational work and expenses; prizes, contests and trips; camps; and educational salaries.

Petitioner's motion is based on the ground that respondent's determination amounts to a regulation of the insurance industry by the Federal Government in violation of the McCarran-Ferguson Act, 15 U.S.C. secs. 1011–1015 (1970). This argument was fully considered and decided adversely to petitioner's position in the recent case of *Hanover Insurance Co. v. Commissioner,* 65 T.C. 715, 721–723 (1976). Accordingly, petitioner's motion for summary judgment will be denied.

No definition appears in either the statute or in respondent's regulations for the phrase "mutual insurance company." However, the courts have in a number of cases recognized several characteristics which are indicative of a mutual insurance company. Those characteristics most often cited as typifying a mutual insurance company are: (1) Common equitable ownership of assets by members; (2) the right of policyholders to be members to the exclusion of others and to choose management; (3) a sole business purpose of supplying insurance at cost; and (4) the right of members to the return of premiums which are in excess of the amount needed to cover losses and expenses. *Thompson v. White River Burial Ass'n.,* 178 F.2d 954 (8th Cir. 1950); *Ohio Farmers Indemnity Co. v. Commissioner,* 108 F.2d 665 (6th Cir. 1940), affg. 36 B.T.A. 1152 (1937); *Modern Life & Accident Insurance Co. v. Commissioner,* 49 T.C. 670 (1968), affd. 420 F.2d 36 (7th Cir. 1969); *Estate of Clarence L. Moyer v. Commissioner,* 32 T.C. 515 (1959); Rev. Rul. 74–196, 1974–1 C.B. 140.

1. *Equitable Ownership of the Assets by the Members*

We have no doubt but that petitioner's members are the equitable owners of its assets. Respondent does not appear to contend otherwise. Petitioner's bylaws clearly provide that upon liquidation the assets remaining after payment to creditors shall be distributed to the members on a pro rata basis.

2. *Right of Policy Holders to be Members to the Exclusion of Others and the Right to Choose Management*

Membership in petitioner is not restricted to policyholders. The basic requirements for membership, as set forth in petitioner's bylaws, are that an applicant: (1) Be of good moral character; (2) derive an appreciable portion of his

income from an agricultural or related endeavor; and (3) pay the prescribed annual dues. During the years in issue approximately 8 percent of petitioner's members were not policyholders.

Petitioner's officers and directors were elected by delegates to its annual convention. These delegates were elected by the members at the local level. All members, whether or not policyholders, had the same voting rights. There is no requirement in petitioner's bylaws that delegates be policyholders or that the officers and directors be policyholders.

In *Holyoke Mutual Fire Insurance Co. v. Commissioner*, 28 T.C. 112 (1957), we held that the taxpayer was a mutual insurance company notwithstanding the existence of 1,000 shares of guaranty capital, the holders of which were entitled to elect one-half of the directors. In that case, however, the directors were required to be policyholders. Although we believe petitioner was dominated by its policyholders, it is nevertheless clear that the policyholders did not have the right to be members and to choose management to the *exclusion of others.*

3. *Sole Business Purpose of Supplying Insurance at Cost*

Respondent's primary argument is that petitioner lacked this characteristic. In respondent's view petitioner's policyholder surplus was unreasonable in amount and was not held for the purpose of paying losses and expenses. Thus respondent concludes that petitioner was not providing insurance at *cost.* Secondly, respondent points to the fact that petitioner was engaged in several activities, unrelated to its insurance operations, as evidence that petitioner did not exist for the *sole* purpose of providing insurance at cost to its members.

a. *Unreasonable Surplus*

We do not agree with respondent that petitioner unreasonably accumulated surplus. We note that petitioner's bylaws give its directors wide discretion in determining what amount of surplus is needed to provide against contingencies and what amount should be distributed to the members. There has been absolutely no evidence that the directors have abused their discretion. Cf. *Order of Railway Employees v. Commissioner,* 2 T.C. 607 (1943).

A mutual insurance company may, as respondent concedes, retain earnings for the purpose of meeting contingencies and extraordinary losses which may be fairly anticipated. *Theodore v. Commissioner,* 38 T.C. 1011 (1962). The essential questions are whether the surplus was reasonable in amount and whether it was held for the purpose of paying losses and expenses. That substantial investment income was derived from the surplus is not fatal as any reasonable amount of surplus should be invested rather than kept idle. *Mutual Fire, Marine & Inland Insurance Co. v. Commissioner,* 8 T.C. 1212 (1947).

Although neither party has suggested a precise formula for determining a reasonable amount of surplus, petitioner relies heavily on *Mutual Fire, Marine & Inland Insurance Co. v. Commissioner, supra,* where we stated at pages 1221–1223:

> We think the reasonableness of the reserve * * * is a matter of proportion, rather than size, and that the amount of the risks underwritten is a primary factor in the determination. While loss experience may be of considerable value, the hazard of unusual losses which might result from large disasters must also be given weight in estimating the amount which may reasonably be withheld from present distribution to the policyholders of a mutual fire insurance company. * * *
>
> In the instant case the surplus was approximately two and one-half million dollars, while the insurance in force was in excess of three hundred seventy million dollars and in 1941 came to exceed four hundred million dollars. Upon a percentage basis, the surplus in the taxable years ranged between .6 and .7 of 1 per cent of the amount of insurance in force. A part of this insurance was reinsured, but the exact amount of the net risk has not been stated. The gross losses paid in 1939, 1940, and 1941 were about $1,525,000, of which the petitioner paid $845,000 and its reinsurers $680,000; the petitioner's share being 55 per cent. The total amount at risk in those years ranged from 375 million to 433 million dollars. On the assumption that the petitioner had retained only 55 per cent of the total risks, the petitioner's share ranged from 207 million to 238 million dollars. The surplus was between 1.1 and 1.2 per cent of this net risk. Although the surplus was increased by some $380,000 in those years, the insurance in effect increased by nearly sixty million dollars, the percentage of increase being practically the same.
>
> * * *
>
> We do not agree with the respondent that the surplus, in proportion to the amount of insurance in effect, even considering reinsurance, is an excessive reserve. While it may appear large in comparison with actual losses, we think it is not unreasonable when possible losses in the event of a large conflagration are considered. * * *

While the total amount of insurance in force cannot be determined from the record, we do know that the total property insurance in force in January 1972 was approximately $563 million. Petitioner's policyholder surplus as of December 31, 1971, was 0.7 of 1 percent of that amount. However, respondent argues that petitioner's participation in the reinsurance pool so reduced the potential impact of a catastrophic loss that the total insurance in force is not a realistic measuring device in analyzing the amount of surplus needed. Petitioner's participation in the pool did have an impact on the amount of surplus needed to meet extraordinary losses but we do not believe the impact was so great as to render the total amount of insurance in force an irrelevant consideration. In our view, the effect of the reinsurance pool was to spread the impact of a catastrophic loss over a 5-year period. But as a result of the manner in which petitioner's payments to the pool were computed, it ultimately had responsibility for all losses incurred by its policyholders to the extent of the coverage provided by their policies. In light of the extent of petitioner's ultimate liability, we are unable to conclude that a surplus of less than 1 percent of the total risk underwritten was unreasonable.

Although we would be hesitant to rely primarily on the tests used by NAIC in evaluating the financial stability of an insurance company,[5] we are nevertheless influenced to some degree by the fact that the ratio of petitioner's net premium to surplus is at about the midpoint in the usual range for financially sound companies. We are also persuaded to some extent by the testimony and written report submitted on petitioner's behalf by Donald R. Childress, a professor of insurance at the University of Oklahoma. After making a thorough analysis of petitioner's operations, Professor Childress concluded that petitioner's surplus was not in excess of the amount needed to adequately protect the policyholders.

b. *Unrelated Activities and Investments*

Petitioner's bylaws enumerate a number of general organizational purposes which are unrelated to providing

---

[5] Respondent argues that the tests used by NAIC are premised on the assumption that an insurance company can never be too sound; i.e., surplus can never be excessive in terms of providing an adequate cushion for extraordinary losses.

insurance to its members. And during the years in issue petitioner was unquestionably involved in a number of activities which were not related to petitioner's insurance operations. However, we think the bylaws indicate that petitioner's sole *business* purpose was to provide insurance to its members at cost. Furthermore, we think petitioner's actual operation evinces a sole *business* purpose of providing insurance to its members.

The chart set out at the conclusion of our findings compares the amount of membership income (derived from annual dues) with the expenses incurred in carrying out the noninsurance activities. Although the expenses associated with these noninsurance activities exceeded membership income in several years, it is clear that over the long term these expenses were more than covered by membership income. In short, petitioner's noninsurance activities were extremely limited in scope and placed no burden on petitioner's operating revenues. Nor did these expenses serve to increase the cost of insurance to petitioner's policyholders.

This is to be sharply contrasted with the situation in *National Chiropractic Insurance Co. v. United States,* 365 F.Supp. 971 (S.D. Iowa 1973), affd. 494 F.2d 332 (8th Cir. 1974). The insurance company in that case was denied "mutual status" because its policyholders were required to waive their right to a return of excess premiums and the company donated $150,000 of such excess to a charitable foundation. No such waiver was required here and the expenses were not out of excess premiums. Since petitioner's noninsurance activities were not motivated by a business purpose and since the expense of these activities did not increase the cost of insurance, we conclude that petitioner's sole business purpose remained that of providing insurance to its members at cost.

Respondent also asserts that the nature of some of petitioner's investments indicates that petitioner did not have as its sole business purpose the insuring of its members at cost. Respondent specifically objects to petitioner's investments in: (1) The Oklahoma Farmers Union Cooperative; (2) the stock casualty company; (3) the life insurance company; and (4) the Oklahoma Farmers Union Supply Association. There is no question but that a mutual is entitled to invest its surplus. Indeed, surplus should be invested rather

than kept idle. *Mutual Fire, Marine & Inland Insurance Co. v. Commissioner, supra.* Investment decisions are within the discretion of the company's officers and directors, and we are highly reluctant to judge the wisdom of these decisions. With the benefit of hindsight we agree that petitioner might have made investments with a higher rate of return. However, we will not deny petitioner's status as a mutual merely because investments made years ago were not yielding a high return during the years in issue.

4. *The Right of Members to a Return of Premiums in Excess of the Amount Needed to Cover Losses and Expenses*

Petitioner's bylaws clearly give its members the right to a return of premiums in excess of the amount needed to cover losses and expenses. It is not necessary that there be actual distributions to policyholders before a company can qualify as a mutual. *Modern Life & Accident Insurance Co. v. Commissioner, supra* at 670. The following statement by the Eighth Circuit in *Thompson v. White River Burial Ass'n., supra* at 957, underscores this point:

> To say that an essential of mutual insurance is that the excess of premiums received over the actual cost of insurance shall be returned to the policyholders is but another way of saying that the essential of mutuality is insurance at cost. It is not necessary to mutuality that periodic returns from premiums collected be made to the members of an association. It is enough that the power exists when a surplus of premium receipts over cost of insurance in fact exists; and the determination of the existence of the appropriate surplus is largely within the discretion of those charged with the management of the association. Order of Railway Employees v. Commissioner, 2 T.C. 607, 613-615. * * *

We have already determined that petitioner's surplus was reasonable in amount and that it was held for the purpose of paying losses and expenses. Maintaining an adequate surplus is a cost of insurance. To the extent petitioner is able to accumulate surplus in excess of the amount needed to provide against fairly anticipated contingencies, its members will be entitled to a distribution.

This case presents a close question. Petitioner possesses three of the four characteristics typically found in a mutual insurance company. The characteristic which petitioner lacks is the right of its policyholders to be members and to choose management to the *exclusion of others*. The policyholders are

members and do have the right to choose management but they do not have the exclusive right to do so. Approximately 8 percent of petitioner's voting members are not policyholders. Even so, we believe that petitioner should be taxed as a mutual insurance company. In *Modern Life & Accident Insurance Co. v. Commissioner, supra* at 673, we reviewed the pertinent legislative history and found a congressional "intent to define mutual insurance companies in an extremely broad manner for Federal tax purposes, i.e., in the sense of policyholder-oriented organizations as opposed to stock companies." Therefore, the ultimate question is whether petitioner was a policyholder-oriented organization or a stockholder-oriented organization. After carefully considering all the facts, we believe the answer is that petitioner is policyholder oriented, notwithstanding the existence of a small number of nonpolicyholder members.

Petitioner has conceded the adjustment in the notice of deficiency relative to an additional capital gain.

*Decision will be entered under Rule 155.*